# Exhibit A

STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  DOCKET NO.

JENNIFER PARDI-MCCARTHY,            )
                                    )
    Plaintiff                   )
                                    )                COMPLAINT FOR DAMAGES
v.                                  )                AND INJUNCTIVE RELIEF
                                    )                AND DEMAND FOR JURY TRIAL
PROFESSIONAL DISABILITY             )
ASSOCIATES, LLC; THE ADVOCATOR      )
GROUP, LLC; BROWN & BROWN           )
INSURANCE, INC.; and BROWN &        )
BROWN ABSENCE SERVICES GROUP,       )
LLC,                                )
                                    )
    Defendants.                 )
_____)

NOW COMES the Plaintiff, Jennifer Pardi-McCarthy ("Ms. Pardi-McCarthy"),

by and through the undersigned counsel, and complains against Defendants, Professional

Disability Associates, LLC, The Advocator Group, LLC, Brown & Brown Insurance, Inc.

and Brown & Brown Absence Services Group, LLC as follows:

<u>SUMMARY OF THE CIVIL RIGHTS ACTION</u>

Plaintiff Jennifer Pardi-McCarthy brings this complaint against Defendants to

secure relief, legal and equitable, for unequal pay for comparable work in violation of the

Maine Equal Pay Law, 26 M.R.S. §§ 628, 626-A. In addition, as set forth below,

Defendants terminated Plaintiff, in whole or in part, because of her gender, her

association with her disabled parents, and/or in violation of her rights under the Family

and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* and Maine's Family

Medical Leave Requirement Act ("MFMLR"), 26 M.R.S. §§ 844 *et seq.*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF -- 1

<u>PARTIES AND JURISDICTION</u>

1. Plaintiff Jennifer Pardi-McCarthy is a United States citizen residing in the City of Westbrook, County of Cumberland, State of Maine.

2. Defendant Professional Disability Associates, LLC, is a limited liability company registered to do business in the State of Maine, with its principal place of business in the City of Portland, County of Cumberland, State of Maine.

3. Upon information and belief, in 2018, Defendant Professional Disability Associates, LLC was acquired by Defendant The Advocator Group, LLC.

4. Defendant The Advocator Group, LLC, is a limited liability company that, upon information and belief, is a subsidiary of Defendants Brown & Brown Absence Services Group, LLC and Brown & Brown Insurance, Inc., and has its principal place of business in the City of Daytona Beach, State of Florida.

5. Defendant Brown & Brown Absence Services Group, LLC. is a limited liability company registered to do business in the State of Maine, with its principal place of business in the City of Daytona Beach, State of Florida.

6. Upon information and belief, Defendant Brown & Brown Absence Services Group, LLC is owned by Defendant Brown & Brown Insurance, Inc.

7. Upon information and belief, Defendant Brown & Brown Insurance, Inc. is a company incorporated under the laws of the State of Florida, with a principal place of business in the City of Daytona Beach, State of Florida.

8. Because this action is brought under the laws of the State of Maine and because Plaintiff resides in Cumberland County, jurisdiction and venue in the Cumberland County Superior Court are proper pursuant to 14 M.R.S. § 501.

9. Defendant Professional Disability Associates, LLC had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

10. Defendant The Advocator Group, LLC had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

11. Defendant Brown & Brown Absence Services Group, LLC had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

12. Defendant Brown & Brown, Inc. had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

13. Some or all of the Defendants are joint employers and/or a single integrated enterprise.

14. Defendants had 50 or more employees working within 75 miles of its office in Portland, Maine where Ms. Pardi-McCarthy worked in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

15. Defendants employed more than 15 employees in its office in Portland, Maine where Ms. Pardi-McCarthy worked at all times material to this Complaint.

16. Ms. Pardi-McCarthy worked more than 1250 hours in the twelve months preceding her use of intermittent leave to care for her parents in 2020.

## EXHAUSTION OF ADMINISTRTIVE REMEDIES

17. In February 2021, Ms. Pardi-McCarthy timely filed a Charge of Discrimination against Defendants with the Maine Human Rights Commission ("MHRC") alleging unlawful discrimination on the basis of gender and disability (by association with her disabled parents).

18. On April 13, 2022, the MHRC issued a Notice of Right to Sue to Ms. Pardi-McCarthy.

19. Ms. Pardi-McCarthy has exhausted her administrative remedies with respect to all claims that require administrative exhaustion as set forth in this Complaint.

## JURY TRIAL REQUESTED

20. Ms. Pardi-McCarthy requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

21. The allegations in paragraphs 1-20 are realleged and incorporated by reference.

22. On or about September 7, 2013, Ms. Pardi-McCarthy was hired by Professional Disability Associations, LLC ("PDA") as a Lead Technical Claim Consultant.

23. Within around 2 months of her hire, Ms. Pardi-McCarthy was promoted to Manager and by the end of 2013, she was promoted to Director of Specialized Claims Services.

24. In 2018, Ms. Pardi-McCarthy was promoted to Vice President, Specialized Claims Services, and her role was expanded to include management level employees among her direct reports and additional responsibilities managing the TPA department.

25. Ms. Pardi-McCarthy's work performance for Defendants was satisfactory or better throughout her employment.

26. When Defendant PDA hired Ms. Pardi-McCarthy, it had just started a Third Party Administrator services program (TPA), which is now called Specialized Claim Services.

27. Ms. Pardi-McCarthy grew the TPA from a handful of employees and one client, to an expansion of several projects under the same client, which became Defendant PDA's largest TPA client.

28. In or around July 2018, Defendant PDA was acquired by Defendant The Advocator Group, LLC ("TAG"), also known as Brown & Brown Absence Services Group, LLC, a wholly owned subsidiary of Brown & Brown Insurance, Inc.

29. In or around early 2018, during the time of year that management conducted salary reviews, Ms. Pardi-McCarthy's leadership team inadvertently received a copy of a spreadsheet that showed everyone's salaries.

30. As a result of receiving a copy of the spreadsheet with everyone's salaries, Ms. Pardi-McCarthy learned that her male counterpart, Mark Sawyer, had a salary that was approximately $42,000 higher per year than hers and that of her female counterpart, Doreen Riordan, Vice President, Clinical Services.

31. Defendant PDA hired Mr. Sawyer as Vice President of Consulting, in around May 2016.

32. In around May 2016, Defendant PDA paid Ms. Riordan and Ms. Pardi-McCarthy annual salaries of $118,000, while it paid Mr. Sawyer an annual salary of $160,000.

33. From around May 2016 when Mr. Sawyer was hired and throughout Ms. Riordan's and Ms. Pardi-McCarthy's employment with Defendants, all three of them were regarded by management and direct reports as laterals working at the same level of role and responsibility.

34. The work that Mr. Sawyer, Ms. Riordan and Ms. Pardi-McCarthy performed was in fact comparable in terms of skill, effort, and responsibility. For example:

   i. All three of their roles required a deep understanding of the disability insurance industry.

   ii. All three have over 20 years of experience in the disability insurance industry.

   iii. All three of their roles required developing and fostering relationships at various leadership levels with current and potential new clients.

   iv. All three had external, client-facing responsibilities.

   v. All three were expected to bring in clients and upsell and cross-sell services.

   vi. All three had responsibilities to develop strategics, materials and risk assessments.

35. To the extent there were differences in their overall roles, Ms. Pardi-McCarthy and Ms. Riordan exerted greater effort and had greater responsibility to generate revenue, manage a budget and supervise employees.

36. Mr. Sawyer expressed to Ms. Pardi-McCarthy that he did not know how she did everything in her position and acknowledged he could not do it.

37. Ms. Pardi-McCarthy, on the other hand, had performed (and continued to perform at times) the exact consulting work that Mr. Sawyer was hired to do in combination with her other duties.

38. Mr. Sawyer was hired into a newly created position.

39. Before Mr. Sawyer was hired, Vern Baillargeon, Senior Vice President of Customer Performance Solutions, was the sole employee of the consulting arm of Defendant PDA.

40. During 2013-2015, Lynn Abood (a former Director) and Ms. Pardi-McCarthy (a Director at the time) ran Specialized Claim Services, and they both supported Mr. Baillargeon with approximately 5 consulting initiatives, all of which were successful and created more business opportunities.

41. Based on the number of consulting projects PDA had in the pipeline, it was clear Defendant PDA needed a full-time, dedicated resource to assist Mr. Baillargeon.

42. Ms. Abood expressed an interest in the role and was told that she would be considered but she was never interviewed for the position, nor was the position posted.

43. Instead, Mr. Sawyer was hired, without consideration of Ms. Abood or communication with her about the reason she was bypassed.

44. Once Mr. Sawyer was hired, he worked under Mr. Baillargeon's direction for every consulting initiative.

45. In or around 2018, soon after they discovered the difference in pay between them and Mr. Sawyer, Ms. Pardi-McCarthy and Ms. Riordan reported to management the pay inequities.

46. Defendants told Ms. Pardi-McCarthy and Ms. Riordan that the company would conduct an in-house compensation assessment.

47. Ms. Pardi-McCarthy asked Patti Dumond in Human Resources on several occasions about the status of the response to her pay equity concerns and she repeatedly said it was under review or gave other vague answers.

48. Ultimately, Ms. Dumond told Ms. Pardi-McCarthy and Ms. Riordan in separate meetings that the in-house compensation assessment confirmed they were being paid appropriately.

49. Defendants' in-house compensation assessment was based on very limited data.

50. Defendants' in-house compensation assessment failed to take into consideration the actual job duties and responsibilities that Mr. Sawyer, Ms. Riordan, and Ms. Pardi-McCarthy had.

51. Defendants never asked Ms. Pardi-McCarthy or Ms. Riordan to confirm the job descriptions or other tools they were using for the in-house compensation assessment to see if they accurately depicted their roles and responsibilities.

52. Ms. Riordan told Ms. Dumond that management's in-house compensation assessment was flawed because it relied on inaccurate descriptions of the three jobs that were to be compared (hers, Ms. Pardi-McCarthy's and Mr. Sawyer's).

53. Defendants privately told Ms. Riordan they would increase her pay by $20,000 annually but if she told Ms. Pardi-McCarthy about the increase, she would be terminated.

54. Ms. Riordan ultimately resigned without having another job due to Defendants' inequitable treatment of women.

55. Ms. Dumond did not show Ms. Pardi-McCarthy a copy of the compensation assessment, or invite her to respond or provide any additional information for management to consider in its review of her report about unequal pay.

56. When Defendants finally did respond to Ms. Pardi-McCarthy's report about unequal pay, their management issued her a written warning, in part, for talking to Ms. Riordan about the pay disparity.

57. At some point, Defendants told Ms. Pardi-McCarthy they could consider a performance-based bonus program to bridge some of the salary gap, even though Mr. Sawyer was not subject to such a program to be paid his substantially higher salary.

58. Defendants never increased Ms. Pardi-McCarthy's compensation to address the pay disparity between her and Mr. Sawyer.

59. From the time Ms. Pardi-McCarthy reported the unequal pay until her termination in 2020, the salary difference between her and Mr. Sawyer widened from an annual difference of $42,000 to a gap of $44,400.

60. At the time of her termination in 2020, Defendants paid Ms. Pardi-McCarthy an annual salary of $125,558, while it paid Mr. Sawyer an annual salary of $169,958.

61. In or around September 2019, Ms. Pardi-McCarthy's manager retired suddenly, even though he had committed to stay on for 3 years after the 2018 TAG acquisition.

62. In or around September 2019, Stacy Williams, Vice President of Finance of Defendant TAG, became Ms. Pardi-McCarthy's manager.

63. In or around March 2020, due to the pandemic, Ms. Pardi-McCarthy began working remotely, as did most of the Defendants' employees.

64. In or around April or May 2020, Mike Shunney was promoted to CEO of Defendant PDA, while also remaining CEO of Defendant TAG.

65. In or around June 2020, Michael Cleveland was hired as President of Defendant PDA and he became Ms. Pardi-McCarthy's manager.

66. Mr. Cleveland did not take time to learn about Ms. Pardi-McCarthy or her role or contributions to Defendant PDA; he rushed her off their weekly 1-on-1 calls, dismissed her ideas, and gave her no feedback.

67. In contrast, Mr. Cleveland took time to get to know male employees and he displayed interest in and respect for them. He also shared more information with them regarding business matters than he did with Ms. Pardi-McCarthy.

68. Mr. Shunney treated Mr. Sawyer more favorably than Ms. Pardi-McCarthy. For example, even though Ms. Pardi-McCarthy's department was on target to meet her revenue goal and Mr. Sawyer was not close to meeting his revenue goal, Mr. Shunney threatened Ms. Pardi-McCarthy that he would look at fixed expenses if her department's revenue did not improve. Mr. Shunney imposed no such consequences on Mr. Sawyer for failing to meet his revenue goal.

69. Month after month, Mr. Sawyer consistently was well-below revenue target and did not have business in the pipeline, whereas Ms. Pardi-McCarthy and Ms. Riordan generally met or exceeded their revenue targets and maintained business in the pipeline.

70. Because Mr. Sawyer had little to no business in the pipeline, he was assigned to take the lead on business development, while Ms. Pardi-McCarthy and Ms. Riordan were asked to focus on making up the revenue lost due to Mr. Sawyer not meeting his revenue targets.

71. Mr. Shunney assigned Mr. Sawyer most if not all of the new business initiatives and he was given accolades and positive feedback, whereas Ms. Pardi-McCarthy was not assigned new business initiatives and received no feedback or accolades.

72. Mr. Shunney took credit for Ms. Pardi-McCarthy's ideas. For example, in around the spring of 2020, Ms. Pardi-McCarthy had an idea about a new product. Mr. Shunney asked her to put it in a document so he could review it with his colleagues, and Ms. Pardi-McCarthy did so. The product was specifically targeted towards an increase in utilization of mental health resources, EAP and a partnership with Brown & Brown's services division as the COVID-19 pandemic was emerging. Ms. Pardi-McCarthy heard nothing about it until months later when she learned that a similar product was developed with Mr. Sawyer. Ms. Pardi-McCarthy was not asked to even assist or partner with Mr. Sawyer.

73. Mr. Shunney shunned and scolded Ms. Pardi-McCarthy in front of her peers and direct reports for asking that one of her female direct reports, Kim Winslow, attend a meeting that pertained directly to Ms. Winslow's work. Mr. Shunney did

not treat male employees in such a disrespectful manner, and he was quicker to defer to their ideas and judgment than he was with Ms. Pardi-McCarthy.

74. In or around July 2020, Ms. Pardi-McCarthy's father was diagnosed with advanced terminal leukemia and he was hospitalized several times.

75. In or around 2019, Ms. Pardi-McCarthy's mother was diagnosed with frontotemporal dementia, and when her father was hospitalized in July 2020, Ms. Pardi-McCarthy learned that her mother's health had severely declined to the point that she could not live independently.

76. With Ms. Pardi-McCarthy's father's health crisis came having to arrange care for her mother and move her to assisted living.

77. Ms. Pardi-McCarthy had taken intermittent FMLA leave in 2019 over a period of around one month to help care for her mother at that time, but it was a struggle to get her request approved and she ended up working full time anyway (just different hours). Although Cigna managed the FMLA request, Defendants were involved and well aware of the difficulties Ms. Pardi-McCarthy was having getting the simple request approved.

78. In or around July 2020, Ms. Pardi-McCarthy was distraught over her father's terminal diagnosis and she was overwhelmed by the thought of going through the difficult FMLA process again as she was still working full time, albeit different hours.

79. Ms. Pardi-McCarthy made it clear in several emails to Mr. Cleveland and everyone on her team that her parents were having health crises and that she needed to help care for them.

80. In several emails that she sent in July and August 2020, Ms. Pardi-McCarthy requested flexible hours to accommodate her need to care of her ill, disabled parents.

81. During this time, Ms. Pardi-McCarthy took time away from her regular business hours and missed some meetings while she was sorting out the emergency health situation with her parents. She kept Mr. Cleveland and her team informed.

82. Ms. Pardi-McCarthy's email to Mr. Cleveland made it clear that her parents both have disabilities and that her circumstances warranted intermittent FMLA leave under state and federal law.

83. Defendants did not initiate the FMLA process with Ms. Pardi-McCarthy even though they knew she was eligible for intermittent FMLA leave under state and federal law.

84. On or about August 21, 2020, Ms. Pardi-McCarthy father's oncologist informed her and her sisters that their father had days or a few weeks to live, and their father's only request was to go home and live out the rest of his life in the home that he and their mother shared for over forty years.

85. To continue to care for her father, Ms. Pardi-McCarthy and her sisters set up a schedule to take turns to help care for him.

86. Ms. Pardi-McCarthy's use of intermittent leave to care for her ill parents was protected by the FMLA and MFMLR.

87. During the week of August 24, 2020, Mr. Cleveland cancelled their weekly senior staff meeting and other meetings were limited as not only was Ms. Pardi-

McCarthy out of the office, but at least three other senior staff (Kevin Riley, Stacy Williams and Mike Shunney) were also out.

88. On or about August 27, 2020, Ms. Pardi-McCarthy emailed Mr. Cleveland and her team that her father was coming home and that they were coordinating with hospice and planning a final visit between him and her mother, whom they had moved to a nursing home.

89. Ms. Pardi-McCarthy continued to keep in touch with Mr. Cleveland and her team as she was tending to her parents, and she worked as much as she could.

90. On or about August 27, 2020, Ms. Pardi-McCarthy spoke with Mr. Cleveland for a quick check in.

91. Following her request for intermittent leave to care for her parents, Mr. Cleveland treated Ms. Pardi-McCarthy as if she didn't work there by excluding her from information-sharing and by not seeking her input regarding decision making.

92. On September 4, 2020, just weeks after Ms. Pardi-McCarthy provided notice regarding her parents' disabilities and health crises and while she was taking intermittent leave to care for them, Defendants abruptly terminated her in a meeting with Mr. Cleveland and Holli Sannito from Human Resources.

93. Mr. Cleveland told Ms. Pardi-McCarthy the reason she was being terminated was for poor leadership judgment when, he claimed, she went back to a client (Prudential) regarding a staffing issue after he told her twice not to do so.

94. The reason Mr. Cleveland gave for Ms. Pardi-McCarthy's termination is false and pretextual for several reasons, including but not limited to:

    i. Mr. Cleveland never told Ms. Pardi-McCarthy not to go back to Prudential to address the staffing issue.

    ii. Mr. Cleveland never asked Ms. Pardi-McCarthy why she made the decision to go back to Prudential or discussed the issues with her before firing her.

    iii. It was part of Ms. Pardi-McCarthy's job as Vice President of her department to ensure they had the best people staffed to meet project expectations, which was the basis of the discussions with Prudential in question.

    iv. Ms. Pardi-McCarthy's communication with Prudential was not out of the ordinary; she had successfully taken this approach with other clients as did her other managers in like situations.

    v. There was no negative impact either to Prudential or Defendant PDA. The good relationship that Ms. Pardi-McCarthy and Defendants had with Prudential was maintained.

95. During Ms. Pardi-McCarthy's employment with Defendants, Mr. Shunney made gender-biased statements, including but not limited to:

    i. In or around May 2019, Mr. Shunney took Ms. Pardi-McCarthy's team out to dinner after a half-day strategy planning session. When talking about his son being newly engaged, he said his son's girlfriends are considered "lease to own" and to "test drive them before you buy."

       ii.  Mr. Shunney made rude comments about a female Vice President of Defendant PDA's largest client at the time, whereas he did not make similar types of comments regarding male clients or employees.

96. When Ms. Pardi-McCarthy was terminated, she was offered no severance pay even though PDA offered severance to male employees who were terminated for reasons that were similar or worse than the reason Mr. Cleveland claims he terminated Ms. Pardi-McCarthy.

97. After Ms. Pardi-McCarthy was terminated, Mr. Cleveland replaced her with a male whom he had known and worked with previously.

98. Mr. Cleveland's abrupt decision to terminate Ms. Pardi-McCarthy without warning is consistent with his pattern of treating Ms. Pardi-McCarthy differently than the male employees as described above, including that he did not take the time to get to know her or understand her work, as he did with male employees, and that he gave male employees more deference and respect than he gave to Ms. Pardi-McCarthy.

99. Upon information and belief, Mr. Cleveland held Ms. Pardi-McCarthy to a higher standard than similarly situated male employees who were not terminated and/or similarly situated employees who were not taking family and medical leave.

100.   Ms. Pardi-McCarthy's past use and anticipated continued use of protected family and medical leave was also a but for cause of her termination as evidenced by the probative timing and evidence of pretext and dishonesty on the part of Defendants.

101.     Defendants knowingly and willfully violated Ms. Pardi-McCarthy's rights under the FMLA and MFMLR.

102.     Defendants unlawfully discriminated against Ms. Pardi-McCarthy with knowing and reckless indifference to her rights and also with malice.

103.     The timing of Defendants' termination of Ms. Pardi-McCarthy was cruel. Ms. Pardi-McCarthy was terminated during the same period of time that she was supporting her father through his end of life process.

104.     As a result of the termination, Ms. Pardi-McCarthy lost her income and needed health insurance benefits.

105.     Ms. Pardi-McCarthy immediately and diligently sought other employment but was unable to find a comparable position, so after three months of looking, in order to make ends meet, she accepted a position that was lower in pay and in status than the position she held with Defendants.

106.     As a result of Defendants' unlawful discrimination against Ms. Pardi-McCarthy, she has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, anxiety, humiliation, and other pecuniary and non-pecuniary losses.

107.     Ms. Pardi-McCarthy has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and she will continue to suffer irreparable injury from her treatment by Defendants unless and until Defendants are enjoined by this court.

## LEGAL CLAIMS

### Count I
### Denial of Equal Pay for Comparable Work in Violation of the

**Maine Equal Pay Law, 26 M.R.S. §§ 628, 626-A**

108.    The allegations in paragraphs 1-107 are realleged and incorporated by reference.

109.    Defendants failed to pay Plaintiff equal pay for comparable work, in violation of 26 M.R.S. §§ 628, 626-A.

110.    As a result of Defendants' denial of equal pay, Plaintiff has suffered and will continue to suffer damages, including but not limited to unpaid wages.

<u>Count II</u>
**Interference with, Restraint and Denial of Intermittent Leave in Violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 _et seq._**

111.    The allegations in paragraphs 1-110 are realleged and incorporated by reference.

112.    Plaintiff requested and needed intermittent leave to care for her parents who had serious medical conditions at the time of these events.

113.    Plaintiff exercised her right to take a minimal amount of leave.

114.    Defendants anticipated that Plaintiff would require additional leave in the future in connection with care for her parents who had serious medical conditions.

115.    Plaintiff was discharged because of her past and anticipated future use of family and medical leave.

116.    Defendants interfered with, restrained, and denied Plaintiff the right to take family and medical leave to care for her parents by terminating her employment.

117.    Defendants' conduct violates the FMLA.

<u>Count III</u>

**Interference with, Restraint and Denial of Intermittent Leave in Violation of the Maine Family Medical Leave Requirement Act ("MFMLR"), 26 M.R.S. § 844 *et seq*.**

118.     The allegations in paragraphs 1-117 are realleged and incorporated by reference.

119.     Plaintiff requested and needed intermittent leave to care for her parents who had serious medical conditions at the time of these events.

120.     Plaintiff exercised her right to take a minimal amount of leave.

121.     Defendants anticipated that Plaintiff would require additional leave in the future in connection with care for her parents who had serious medical conditions.

122.     Plaintiff was discharged because of her past and anticipated future use of family and medical leave.

123.     Defendants interfered with, restrained, and denied Plaintiff the right to take family and medical leave to care for her parents by terminating her employment.

124.     Defendants' conduct violates the MFMLR.

## Count IV
### Sex Discrimination in Violation of the Maine Human Rights Act, 5 M.R.S. §§ 4553(2), 4572 ("MHRA")

125.     The allegations in paragraphs 1-124 are realleged and incorporated by reference.

126.     Defendants discriminated against Ms. Pardi-McCarthy on the basis of sex by treating her differently than similarly situated male employees, including but not limited to paying her less than her male counterpart, providing her less favorable terms and conditions of employment than those of Defendants' male

employees, subjecting her to offensive gender-based comments and conduct, and terminating her employment.

127.    Defendants' conduct violates the MHRA.

### Count V
### Disability Discrimination in Violation of the Maine Human Rights Act, 5 M.R.S. § 4551 *et seq.* ("MHRA")

128.    The allegations in paragraphs 1-127 are realleged and incorporated by reference.

129.    Ms. Pardi-McCarthy's father had a disability at all relevant times.

130.    Ms. Pardi-McCarthy's mother had a disability at all relevant times.

131.    Ms. Pardi-McCarthy was discharged in whole or in part because of her association with her disabled parents.

132.    Defendants' conduct violates the MHRA.

### REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Enter judgment in Plaintiff's favor;

B. Declare the conduct engaged in by Defendants to be in violation of her rights;

C. Enjoin Defendants, their agents, successors, employees, and those acting in concert with them from continuing to violate her rights;

D. Order Defendants to reinstate Plaintiff or award front pay to Plaintiff;

E. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' discrimination;

F. Award Plaintiff unpaid wages for unequal pay;

G.  Award Plaintiff liquidated damages in an amount equal to twice the amount of her unpaid wages for unequal pay;

H.  Award Plaintiff back pay for lost wages and benefits;

I.  Award liquated damages for violations of her rights under FMLA and MFMLR in an amount to be determined at trial;

J.  Award nominal damages;

K.  Award Plaintiff reasonable attorneys' fees, including legal expenses, and costs;

L.  Award Plaintiff pre-judgment interest;

M.  Permanently enjoin Defendants from engaging in any employment practices which discriminate on the basis of gender, disability or family medical leave;

N.  Require Defendants to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate discrimination in the future;

O.  Require that Defendants post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

P.  Require that Defendants train all management level employees on the protections afforded by state and federal equal pay, gender and disability discrimination, and family and medical leave laws;

Q.  Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants unlawfully terminated her; and

R.  Grant Plaintiff such other and further relief as may be just and proper.

Respectfully Submitted:

DATED:        April 28, 2022

Maria Fox – Bar No. 9957
Stacey Neumann – Bar No. 4608
Alison Tozier – Bar No. 5633
Counsel for Plaintiff Jennifer Pardi-McCarthy

MURRAY PLUMB & MURRAY
75 Pearl Street, 3rd Floor
Portland, ME 04104
(207) 699-3306
(207) 773-8023 (fax)
mfox@mpmlaw.com